UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


MICHAEL DUANE SMITH,

               Plaintiff,              Case No.  05-70467

v.                             District Judge Arthur J. Tarnow
                             Magistrate Judge R. Steven Whalen

CITY OF MOUNT CLEMENS,
ET AL.,

               Defendants.
_____/


**REPORT AND RECOMMENDATION**

Before the Court are Plaintiff's Motion for Partial Summary Judgment [Docket #81] and Defendants' Motion for Summary Judgment [Docket #83], which have been referred for Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons discussed below, I recommend that both motions be DENIED.

## I.   FACTS

On February 14, 2005, Plaintiff Michael Duane Smith filed a *pro se* civil rights complaint under 42 U.S.C. §§ 1983, 1985 and 1990.  On April 7, 2005, he filed an amended complaint, again proceeding *pro se*.  Following a series of pretrial proceedings not relevant to the present motion, *pro bono* counsel was assigned, and a second amended complaint was filed on December 18, 2007 [Docket #65], pursuant to 42 U.S.C. § 1983.

-1-

The second amended complaint alleges violation of Plaintiff's rights under the Fourth and Fourteenth Amendments, arising out of the use of excessive force by Mt. Clemens police officers. More specifically, Plaintiff alleges that following his arrest, Defendant Officer Steven Andrews "sprayed Smith multiple times to determine the location of the illegal narcotics, with Smith was in custody, in handcuffs, and not resisting arrest, and under circumstances where Andrews could not reasonably believe that Smith had illegal narcotics on his person." *Second Amended Complaint*, ¶ 25.

On June 17, 2002, Plaintiff sold illegal drugs to an undercover police officer. *Deposition of Duane Smith*, 32-33 (Defendants' Exhibit B). As a result, he pled guilty in state court to delivery of a controlled substance, and served a sentence of approximately 26 months. *Id.*, 34-35. Not surprisingly, the parties' descriptions of the circumstances of the arrest differ.

### A.   Defendant Andrews' Version

Officer Andrews' version of what happened is set forth in his incident report of June 17, 2002 (Exhibit C, Defendant's Response to Plaintiff's Motion, Docket #86), the preliminary examination transcript from Plaintiff's criminal case (Exhibit I), and Andrews' deposition transcript (Exhibit D).[1]

In his incident report (Exhibit C), Andrews states that on June 17, 2002, he and his

---

[1] With the exception of the deposition testimony of Michael Kenel, the same exhibits attached to Defendants' Response [Docket #86] are attached to Defendants' own motion for summary judgment [Docket #83], albeit in different order.

partner, Officer Kenel, were summoned to the area of Inches and Meadle Streets in

Mount Clemens, to assist in the Plaintiff's arrest.  They received a description of a black

male wearing purple shorts, purple Hawaiian shirt, and a tan hat.  Upon arriving at the

scene in his patrol car, he observed the Plaintiff, who looked directly at him, standing in a

driveway. He ordered Plaintiff to the patrol car, and then "observed Smith place his right

hand into his front right pocket and place an object into his mouth."  Andrews wrote that

based on his experience, "It was clear to me at that time that Smith was attempting to

destroy evidence (crack cocaine)." He states that he saw the Plaintiff repeat this action a

second time. The Plaintiff turned and walked away from Andrews.  Andrews tackled him

to the ground and ordered him to spit out whatever was in his mouth.  He states that

"Smith refused to do so and pulled his hands up to his face and began chewing.  I then

administered a dose of department issued pepper spray to Smith's face and completed

(sic) to order Smith to spit out what was in his mouth.  After spraying Smith he stated,

'it's gone.'  Smith was then handcuffed and conveyed to this pd."

At the Plaintiff's preliminary examination, Andrews testified that when he ordered

Plaintiff to the scout car, Plaintiff turned and walked away from him. *Defendant's Exhibit

I*, 18.  The Plaintiff, he said, twice appeared to reach into his pocket and make a motion

toward his mouth.  *Id.*, 19. He said that when he took the Plaintiff to the ground, the Plaintiff

had his hands up, near his face. *Id*., 24. Andrews testified that after he used the pepper spray,

he had to "muscle" the Plaintiff's hands behind is back.  *Id*., 24.  After the pepper spray was

applied, the Plaintiff said, "It's gone." *Id*. 21, 24-25.  Andrews also testified that an arrestee

is not secure until he is handcuffed and placed in the back of a scout car. *Id.* 26.

At his deposition in this case, Officer Andrews recounted that when he arrived on the scene and exited his patrol car, the Plaintiff looked right at him from a distance of about 20 feet, turned to walk away, reached into his pocket, and put his hand to his mouth. *Andrews Deposition, Defendants' Exhibit D*, 31-31. However, unlike his preliminary examination testimony, he stated that the Plaintiff appeared to put something in his mouth only once. *Id.*, 36. Andrews did not specifically see what the Plaintiff put in his mouth, and conceded that it could have been a piece of candy or a marble. *Id.*, 34. Andrews testified that for security purposes, he told the Plaintiff to put his arms behind his back, because cradling one's hands on his face or underneath his body is a method of resisting arrest. *Id.*, 37-38. After Andrews tackled the Plaintiff, he told him several times to put his hands behind his back, but Plaintiff refused. He also told the Plaintiff to spit out what he had in his mouth. *Id.*, 38. Andrews stated that when the Plaintiff refused to either put his hands behind his back or spit out whatever he put in his mouth, "he was given a dose of the department issued pepper spray." *Id.*, 40.

As to why he used the pepper spray, Andrews also testified as follows:

"Q: Okay. Now, you said earlier that you used the spray just because he was resisting arrest?

A: No, I never said that. I said that I believed that he was attempting to destroy evidence." *Id.*, 56

Later in his deposition, he testified as follows:

"Q: And it is your testimony that that is the only time that OC spray should be

used, when a subject is resisting arrest?

A: No, I didn't say that.

Q: Okay.

A: I never said that that was the only time it should be used.  I said that I used it because that he was resist, physically resist and does not comply with a verbal request.

The verbal request was for him to spit out what I believe to be narcotics in his mouth.  That along with the fact that he was walking away and failed to obey my command to come to the car.

The fact that he was under arrest, all of those things together are what brought about the use of the aerosol spray."  *Id.*, 58.

Andrews also testified that in his view, destroying evidence is the same as resisting arrest.  *Id.*, at 57.

## B.    Plaintiff Smith's Version

At his deposition (Exhibit 3, Plaintiff's Motion for Partial Summary Judgment, Docket #81), Plaintiff testified that he saw Officer Andrews pull up in a squad car.  *Plaintiff's Deposition*, 41.  He stated that he saw Andrews addressing a crowd that had gathered, and at that point, he (Plaintiff) turned and walked away from the patrol car, with his back to Andrews.  *Id.* 47-48.  Plaintiff testified that Andrews jumped on his back, snatched his arms behind his back, and handcuffed him.  *Id.*, 49-50.  He states that he never heard Andrews give him any kind of command prior to being handcuffed.  *Id.* 52-53.  After he was handcuffed, Plaintiff states, he told Andrews he was hearing impaired, whereupon Andrews sprayed him with pepper spray and said, "Now you're visually impaired too."  *Id.*, 53.

-5-

Plaintiff stated that Andrews asked him where the drugs were, and when he answered that

he didn't have them anymore,  Andrews sprayed him with pepper spray again, this time in

his mouth.    After another officer came on the scene, Andrews picked Plaintiff up and

sprayed him again, this time in the face, chest and groin area.  At this point, Plaintiff says,

his shirt was ripped and his pants were coming loose.  *Id*., 56-57.  Plaintiff testified that he

was sprayed a fourth time, in the face, when he got to the police car. *Id.*, 59-60.

### C.    Evidence Regarding Policy and Training

At his deposition, Officer Andrews quoted the Mount Clemens Police Department

Police Procedure Order regarding the use of "Aerosol Subject Restraints" (i.e., pepper spray),

as follows:

> "To effect custody during a lawful arrest of a subject who physically resists or
> threatens to physically resist by assuming an aggressive posture and does not
> comply with verbal requests."  *Andrews Deposition*, Exhibit D, Docket #81,
> at 57.

Andrews testified that it was "common knowledge" that pepper spray could be used

on an individual who was believed to have ingested drugs.  He said that it was something that

was done before he became a Mount Clemens Officer, and it continues to be done, not just

in Macomb County, but across the country.  He knows this, he said, because he has seen it

on television shows, such as COPS and shows on Spike TV.  *Id.*, 58-59.  He said that the

only way to get a suspect to spit out drugs is through the use of the pepper spray.  *Id*. at 61.

Officer Michael Kenel, Andrews' partner on the day in question, testified that the only

training he had in the use of pepper spray was at the Police Academy in 1994 or 1995.

-6-

*Deposition of Michael Kenel*, Defendants' Exhibit E, Docket #83, at 12.  He said that the

Mount Clemens Police Department did not train him to use pepper spray to get a suspect to

spit out drugs.  *Id.* 21.

Mount Clemens Police Officer Mark Berger testified as follows regarding the use of

pepper spray:

> "Q: Have you ever been trained to spray, or trained or instructed to spray an
> arrestee in the face if you suspected that that person may have put drugs in
> their mouth for the purpose of getting the arrestee to spit out the drugs?
>
> A: No.
>
> Q: Have you ever sprayed a suspect with pepper spray in their face to get them
> to spit out drugs?
>
> A: No.
>
> Q: Why not?
>
> A: Because that's not what pepper spray is for.
>
> Q: Okay. And why is pepper spray not for that?
>
> A: Because it's used as a level of force to arrest someone.  to control an arrest
> of the subject."

*Deposition of Mark Berger*, Plaintiff's Exhibit 6, Docket #81, at 11.

Plaintiff has submitted the expert witness report of Larry P. Danaher, a retired Police

Commander and National Police Instructor, an expert in the area of police tactics, policies,

procedures and supervision. *Declaration of Larry P. Danaher*, Plaintiff's Exhibit 5, Docket

#81.[2]  Mr. Danaher opines that the Mount Clemens Police Department did not have proper policies and procedures in place related to Oleoresin Capsicum/Pepper Spray, and that there "should have been a clear policy and/or procedure for officers to follow on when to use it, how to use it, and how to assist the subject who has been contaminated by the spray." *Danaher Declaration*, 4.  He further states, "Standard guidelines used throughout the United States prohibit the use of pepper spray against subjects who passively resist like in this case. I have never seen any guidelines that would allow an officer to use pepper spray as a way to prevent someone from swallowing alleged drugs." *Id.*, 5.  In terms of the present case, Mr. Danaher states:

> "The use of pepper spray in this way is excessive and is improper use of force. I was shocked reading Officer Steven Andrews deposition that he thought his use of pepper spray was standard practice.  He could not recall from what training he had learned this and he could not provide any written material on this type of practice, however he believed it was ok, because he [had] seen it done on television." *Id.*, 5.

The Defendants have proffered the Expert Report of Alexander Ernst, also an expert in the field of police policies and procedures.  Mr. Ernst opines that "Officer Andrews's actions were reasonable, and his deployment of pepper/aerosol spray was appropriate." *Expert Report of Alexander Ernst*, Defendants' Exhibit G, Docket #83, at 3.  However, in terms of the Mount Clemens Police Department's apparent lack of a specific written policy for use of pepper spray, Mr. Ernst writes:

> "I found no [Mount Clemens Police Department] policy dealing directly with

---

[2] Mr. Danaher's *curriculum vitae* is attached to his Declaration.

-8-

the use of aerosol or chemical spray.  Mr. Danaher is correct when he says proper policies should be in place relating to the use of pepper spray or any kind of aerosol spray.  This belief is held by IACP, National Institute of Justice, and all training centers.  The Macomb Criminal Justice Training Center teaches the same philosophy." *Id.*, 6.

Regarding training in the use of pepper spray, Mr. Ernst states:

"No records could be located from the Mt. Clemens Police Department indicating Officer Andrews received training in the use of pepper/aerosol spray.  As stated earlier, it is the general accepted practice in law enforcement in the United States that training must be completed in the use of pepper/aerosol spray before an officer can carry it on the street." *Id.*, 7.

However, Mr. Ernst infers that Officer Andrews was trained in the use of pepper spray based on the fact that other officers said they were trained, and that Andrews seemed to recall what was taught in training.  *Id.*, 7.  He states that "the training issue may be lacking by way of documentation, but it is apparent through testimony of the officers involved and the interviews of the three former officers."  *Id.*, 8.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c).  To prevail on a motion for summary judgment, the non-moving party must show sufficient evidence to create a genuine issue of material fact. *Klepper v. First American Bank*, 916 F.2d 337, 341-42 (6th Cir. 1990).  Drawing all reasonable inferences in favor of the non-moving party, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it

-9-

is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celetox Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact, and summary judgment is appropriate. *Simmons-Harris v. Zelman*, 234 F.3d 945, 951 (6th Cir. 2000).

Once the moving party in a summary judgment motion identifies portions of the record which demonstrate the absence of a genuine dispute over material facts, the opposing party may not then "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact," but must make an affirmative evidentiary showing to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). The non-moving party must identify specific facts in affidavits, depositions or other factual material showing "evidence on which the jury could *reasonably* find for the plaintiff." *Anderson*, 477 U.S. at 252 (emphasis added). If, after sufficient opportunity for discovery, the non-moving party cannot meet that burden, summary judgment is clearly proper. *Celotex Corp.*, 477 U.S. at 322-23.

### III.   DISCUSSION

#### A.   Legal Principles re: Excessive Force

A claim of excessive force brought by a free individual, such as the Plaintiff was at

the time of his arrest, is analyzed under the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 394-95, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). In scrutinizing a claim of excessive force, the constitutional standard is the Fourth Amendment's requirement of reasonableness. *Id*. That standard is objective, and is applied without reference to the officer's subjective motivations. *Id*. In *Gaddis v. Redford Township*, 364 F.3d 763,772 (6th Cir. 2004), the Court set forth the following factors to be considered:

> "Courts must apply an objective standard, looking to 'the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2]whether the suspect pose[d] an immediate threat to the safety of the officers or others, and [3] whether he was actively resisting arrest or attempting to evade arrest by flight.' *Russo v. City of Cincinnati*, 953 F.2d 1036, 1044 (6th Cir. 1992) (quoting *Graham*, 490 U.S. at 396, 109 S.Ct. 1865) (brackets added)."

This is a non-exhaustive list, and the "'proper application' of the reasonableness inquiry 'requires careful attention to the facts and circumstances of each particular case....'" *St. John v. Hickey*, 411 F.3d 762, 771 (6th Cir. 2005), quoting *Graham*, 490 U.S. at 396. The standard "contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002). A court must recognize that "police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a particular situation." *Graham* at 397.

## B.   Defendants' Motion [Docket #83]

### 1.   Why Defendant Andrews is not Entitled to Summary Judgment

Based on the exhibits before this Court, it is apparent that there are questions of material fact as to the circumstances surrounding the Plaintiff's arrest and whether Officer Andrews' use of force was reasonable. Where there is a conflict in the evidence, a court ruling on a summary judgment motion must draw all inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, supra*. The following chart demonstrates the conflicting testimony:

| <u>Plaintiff's Facts</u> | <u>Defendants' Facts</u> |
|---|---|
| Did not hear Andrews issue any commands. | Repeatedly told Plaintiff to spit out drugs and put his hands behind his back. |
| Was sprayed four times after he was handcuffed. | Sprayed Plaintiff once before he was handcuffed. |
| Walked away from Andrews, who was talking to a crowd; no showing that he put anything in his mouth. | Agrees that Plaintiff walked (not ran) away; Andrews' testimony inconsistent as to whether Plaintiff moved his hands toward his mouth once or twice. |
| Plaintiff's expert says using pepper spray to extricate drugs from a suspect's mouth is improper and constitutes excessive force. | Defendant's expert says using pepper spray to extricate drugs is reasonable. |

Taking the Plaintiff's evidence as true, a jury could easily find that Defendant Andrews used unreasonable and excessive force, even affording an appropriate measure of deference to his in-the-field assessment of an unfolding situation. Perhaps most significantly, the jury could find that Andrews sprayed the Plaintiff not once, but four times, after the Plaintiff was handcuffed and subdued, and that Plaintiff was sprayed not only in the face, but in the chest, stomach and groin, areas that have little to do with making a suspect cough up

-12-

drugs.

In *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 902 (6th Cir. 2004), the Court

cited extensive Sixth Circuit precedent to the effect that force applied after a suspect is

subdued can constitute excessive force:

> "We have also consistently held that various types of force applied after the
> subduing of a suspect are unreasonable and a violation of a clearly established
> right. See, *e.g., Phelps v. Coy*, 286 F.3d 295, 301 (6th cir. 2002) ('[T]here was
> simply no governmental interest in continuing to beat Phelps after he had been
> neutralized, nor could a reasonable officer have thought there was.');
> *McDowell v. Rogers*, 863 F.2d 1320, 1307 (6th cir. 1988) ('[A] totally
> gratuitous blow with a policeman's nightstick may cross the constitutional
> line.'); *Lewis v. Downs*, 774 F.2d 711, 715 (6th Cir. 1985) ('The unprovoked
> and unnecessary striking of a handcuffed citizen in the mouth with a nightstick
> is clearly excessive.')."

In fact, even Mr. Ernst, the Defendants' expert, states that if the Plaintiff's version of

events is true, Officer Andrews used excessive force:

> "Michael Smith stated in his deposition, dated May 5, 2008, he was sprayed
> multiple times by Officer Andrews, including while handcuffed.  If this was
> true I believe the chemical spraying would be excessive." *Ernst Report*, at 5.

Further, because the right to be free from non-deadly excessive force was clearly

established at the time of the incident, *Graham v. Connor, supra; Cox v. Treadway*, 75 F.3d

230 (6th Cir. 1996), Defendant is not protected by qualified immunity.  There are generally

two inquiries in a qualified immunity analysis:  (1) did the defendant violate a constitutional

right, and (2) was the right clearly established to the extent that a reasonable person in the

defendant's position would know that the conduct complained of was unlawful. *Saucier v.

Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).  More recently the Supreme

-13-

Court reconsidered the sequential inquiry set forth in *Saucier*, concluding that "while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory." *Pearson v. Callahan*, --- U.S. ----, 129 S.Ct. 808 (2009). In this case, taking the evidence in the light most favorable to the Plaintiff, Defendant Andrews fails both prongs of the qualified immunity test.

### 2.    Why the City of Mt. Clemens is not Entitled to Summary Judgment

Under *Monell v. New York City Dep't of Social Services*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), § 1983 liability cannot be imposed on a theory of *respondeat superior*. In terms of municipal liability, *Monell* held:

> "A municipality cannot be held liable *solely* because it employs a tortfeasor - - or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.*, 436 U.S. at 691. (Emphasis in original).

Instead, a municipality incurs liability only if "action pursuant to official municipal policy of some nature caused a constitutional tort." *Id.*; *Pembaur v. Cincinnati*, 475 U.S. 469, 477, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). In *Johnson v. City of Detroit*, 944 F.Supp. 586, 598 (E.D. Mich. 1996), the Court explained, "The requirement of an official policy distinguishes the acts of the employee from those of the municipality, ensuring that the municipality is held responsible only for the latter."

A municipal policy need not be formal or written to bring § 1983 into play. It can be found in "a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute 'custom or usage' with the force of law.'" *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 108 S.Ct. 915, 99

-14-

L.Ed.2d 107 (1988)(internal citations omitted).  In addition, § 1983 liability can be based on a policy of inadequate training or supervision, but "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

As both Mr. Danaher, the Plaintiff's expert, and Mr. Ernst, the Defendants' expert note, the Mount Clemens Police Department has no specific written policy governing the proper use of pepper spray.  Both experts also agree that it is a generally accepted practice of law enforcement that such standards be in place.  Moreover–and again, both experts agree on this point–there is no documentation that Defendant Andrews received proper training. Notably, Mr. Ernst stressed that "it is the general accepted practice in law enforcement in the United States that training must be completed in the use of pepper/aerosol spray before an officer can carry it on the street." Viewing the evidence in the light most favorable to the Plaintiff, that was not done in Officer Andrews' case. And while Mr. Ernst infers, based on interviews and testimony of *other* officers that Andrews was properly trained, Andrews himself testified that his knowledge of the "common use" of pepper spray to extract drugs from a suspects mouth came from television shows. This conflicts with the deposition testimony of Officers Kenel and Berger that they were never trained to use pepper spray to induce a suspect to spit out drugs.  Berger testified that this would *not* be a proper use of pepper spray. Thus, even apart from the lack of documentary evidence that Andrews received *any* training in the use of pepper spray, the jury could also infer that the City of Mount Clemens failed to train or instruct Andrews that to use pepper spray to extract drugs from a

-15-

suspect's mouth was in contravention of generally accepted law enforcement practices.

Because there are questions of material fact as to whether the City had proper training policies in place regarding the use of pepper spray, and whether Defendant Andrews received proper training before being issued pepper spray, summary judgment is inappropriate on the issue of municipal liability.

### C.    Plaintiff's Motion [Docket #81]

If the jury accepts the Plaintiff's claim that he was sprayed several times after he was handcuffed, or that Officer Andrews used the pepper spray in an unreasonable manner, then the Plaintiff wins on the issue of liability. However, that does not mean that he is entitled to summary judgment, because if we draw all permissible inferences in favor of the Defendants, it is clear that issues of material fact remain.

The Plaintiff bases his argument, in part, on Andrews' deposition testimony that he sprayed the Plaintiff not because he was resisting arrest, but because he was attempting to destroy evidence. *Andrews Deposition*, 56.   But Andrews also testified that the Plaintiff disobeyed not only his command to spit out whatever was in his mouth, but to put his hands behind his back, *id.* 34, 40, and that cradling one's hands on his face or underneath his body is a method of resisting arrest, separate from the question of whether a suspect is trying to destroy evidence.  *Id.*, 37-38.  Andrews also testified that his decision to use pepper spray was based Plaintiff's refusal to obey his verbal command to spit out what he believed were drugs, "along with the fact that he was waking away and failed to obey my command to come to the car." *Id.*, 58.  It is up to the trier of fact to determine whether the Plaintiff was in fact

-16-

resisting arrest.

Plaintiff also argues that Andrews did not see what Plaintiff allegedly put in his mouth, and that the officer testified that it could have been anything, including a piece of candy or a marble.  However, the jury could conclude that under the totality of the circumstances, Andrews reasonably believed that the Plaintiff was attempting to destroy evidence by swallowing the drugs as he fled from the officer.  The Plaintiff had just sold crack cocaine to an undercover officer. From the officer's perspective, he turned and fled after looking directly after the officer. At that time, Andrews did not know that the Plaintiff was hearing impaired, and could have reasonably concluded that the Plaintiff intentionally disobeyed his order to go to the patrol car. Andrews saw the Plaintiff reach into his pocket and put something in his mouth, actions which, in Andrews' experience, were consistent with trying to swallow the evidence.

If the jury accepts the Defendants' version of what happened, it could conclude that Officer Andrews' act of pepper-spraying the Plaintiff one time, before he was handcuffed and while he was actively resisting arrest and disobeying Andrews' direct orders following a controlled narcotics buy, was permissible under the Fourth Amendment's standard of objective reasonableness.  Plaintiff is not entitled to summary judgment.

## IV.   CONCLUSION

I recommend that Plaintiff's Motion for Partial Summary Judgment [Docket #81] and Defendants' Motion for Summary Judgment [Docket #83] both be DENIED.

Any objections to this Report and Recommendation must be filed  within ten (10)

days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sullivan,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.


s/R. Steven Whalen                                       
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated:  August 20, 2009

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on August 20, 2009.

-18-

s/Susan Jefferson
Case Manager